**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ELIZABETH PASQUINE, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )   Case No.: 1:22-CV-469-CMH-IDD |
| | ) |
| DIRECTOR OF THE UNITED STATES PATENT | ) |
| AND TRADEMARK OFFICE, | ) |
| | ) |
| Respondent. | ) |
| | ) |

## RESPONSE TO AMENDED PETITION FOR REVIEW PURSUANT TO 35 U.S.C. § 32

Pursuant to Local Civ. R. 83.5, as well as this Court's September 27, 2022 Order (Dkt. No. 7), Respondent, the Director of the United States Patent and Trademark Office (also referred to as "USPTO" or "agency"), respectfully submits this Response to Elizabeth Pasquine's Amended Petition for Review (Dkt. No. 8) ("Am. Pet.") of an order from the agency sanctioning her for violation of certain USPTO Rules of Professional Conduct.

### INTRODUCTION

Ms. Pasquine, proceeding pro se, was (and still is) an experienced trademark attorney who should have known better and kept an ear to the ground when she worked at LegalForce RAPC Worldwide ("LegalForce")—a law firm focused mostly on assisting clients to apply for and register trademarks before the USPTO.  As the attorney of record for certain trademark applications, she filed various documents with the USPTO that purportedly had proper client signatures, even though she had no knowledge as to whether the clients actually signed them or whether non-licensed, legal ("non-practitioner") assistants signed them on behalf of those clients. The latter is undisputedly forbidden as an impermissible signature practice and jeopardizes the

validity of the applications or any registered trademarks.  With any reasonable degree of diligence, which she was ethically required to exercise under the USPTO Rules of Professional Conduct, she could have easily obtained the identities of those who signed the documents.  But she did not.

Ms. Pasquine's unethical conduct did not end there.  Eventually she learned that the impermissible signature practice at LegalForce potentially implicated *thousands* of trademark applications or registered trademarks.  That should have immediately prompted her to contact her clients and advise them about the possibility that trademark documents she previously filed on their behalf may have been improperly submitted to the USPTO and what remedial steps they could take.  But she did not.  There is record support for all of this.

For these lapses in judgment, the USPTO Director reasonably sanctioned (or disciplined) Ms. Pasquine with a public reprimand and 12 months of probation.[1]  These sanctions are not a clear error in judgment.  Accordingly, this Court should affirm the agency's decision and deny the Amended Petition for Review.

## I.    STATUTORY AND REGULATORY BACKGROUND

Congress has vested the USPTO with the authority to promulgate regulations "govern[ing] the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties before the Office." 35 U.S.C. § 2(b)(2)(D); *see also id.* § 32 (providing that the USPTO "may . . . suspend or exclude . . . from further practice before the Patent and Trademark Office, any person, agent, or attorney . . . who does not comply with the regulations established under

---

[1]  Local Civ. R. 83.5 provides that the USPTO must file a response to a petition for review under 35 U.S.C. § 32 along with a copy of the certified administrative record below, which it did earlier today (*see* Dkt. Nos. 9–21).  Under the local rule, this Court may properly adjudicate the merits of the petition based on: (1) the petition; (2) the USPTO's response thereto; and (3) the administrative record.  No additional briefing or argument is permitted without further order from the Court.  The USPTO has filed neither a *Roseboro* notice nor a notice of hearing with the instant Response.

§ 2(b)(2)(D)").  These statutory provisions grant broad authority to the USPTO to regulate the "service, advice, and assistance" that individuals provide to others "in the prosecution or prospective prosecution of applications" for a patent or trademark registration that are filed with the agency.  *Bender v. Dudas*, 490 F.3d 1361, 1368 (Fed. Cir. 2007).  Pursuant to this statutory authority, the USPTO has promulgated a number of regulations concerning the duties and responsibilities that trademarks attorneys who practice before the agency owe to their clients.

*See* 37 C.F.R. Pt. 11, Subpt. D (USPTO Rules of Professional Conduct); *see also* Changes to Representation of Others Before The United States Patent and Trademark Office, 78 Fed. Reg. 20180, 20201 (Apr. 3, 2013).  These regulations are modeled after the American Bar Association's Model Rules of Professional Conduct.  78 Fed. Reg. at 20201.  Relevant here, trademark attorneys that practice before the USPTO, must: (1) "act with reasonable diligence and promptness in representing a client," 37 C.F.R. § 11.103; (2) "[k]eep the  client reasonably informed about the status of [a] matter, *id.* § 11.104(a)(3); and (3) "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation," *id.* § 11.104(b).

The USPTO Office of Enrollment and Discipline ("OED") investigates allegations of misconduct on the part of practitioners, including trademark attorneys who represent clients (trademark applicants and trademark owners) before the agency.  35 U.S.C. §§ 2(b)(2)(D), 32; 37 C.F.R. §§ 11.2(b)(4)–(5), 11.19.  An investigation may begin after the OED Director receives a grievance, which is defined as a written submission that presents possible grounds for discipline of a specified practitioner.  37 C.F.R. § 11.1.  If an investigation is commenced, the OED Director must notify the practitioner in writing.  *Id.* § 11.22(e).  The OED can—as a part of its investigation into potential misconduct on the part of a practitioner—"request information and evidence regarding possible grounds for discipline of a practitioner," colloquially known as "requests for

information" or "RFIs."  *Id.* § 11.22(f)(1).

After conducting an investigation, if the OED Director is of the opinion that a practitioner has committed professional misconduct, the OED Director may convene a meeting of the Committee on Discipline ("Committee").  *Id.* § 11.32. The Committee determines if probable cause exists to bring disciplinary charges against the practitioner.  *Id.*  If the Committee determines probable cause exists, the OED Director then has discretion to file a disciplinary complaint to institute disciplinary proceedings.  *Id.*  If a complaint is filed, the practitioner must answer the complaint. *Id.* § 11.36.

Disciplinary proceedings are heard by a "hearing officer," who is outside of the supervision of the USPTO Director and the OED Director.  *Id.* § 11.39.  To help ensure the impartiality of the proceedings, the USPTO uses Administrative Law Judges ("ALJs") from outside the agency (other executive agencies) as its hearing officers, including ALJs from the U.S. Department of Housing and Urban Development.  *See* 35 U.S.C. § 32; 37 C.F.R. § 11.39.  Once disciplinary proceedings have been instituted, the ALJs may authorize discovery and depositions, and ultimately will conduct a hearing at which both parties may present documentary evidence and witness testimony. 37 C.F.R. §§ 11.50–11.52.   The OED Director ultimately bears the "burden of proving [a] violation by clear and convincing evidence." *Id.* § 11.49.

After the hearing and briefing, the ALJs issue an initial decision as to whether the OED Director adequately proved that the practitioner committed misconduct—and if so, the ALJ will discharge an appropriate sanction based on four considerations:

> (1) Whether the practitioner has violated a duty owed to a client, the public, the legal system, or the profession; (2) Whether the practitioner acted intentionally, knowingly, or negligently; (3) The amount of the actual or potential injury caused by the practitioner's misconduct; and (4) The existence of any aggravating or mitigating factors.

5

*Id.* § 11.54(b).

The practitioner or the OED Director can appeal the initial decision to the Director of the USPTO (or "USPTO Director").  *Id.* § 11.55.  The USPTO Director "has authority to conduct a de novo review of the factual record," and "may affirm, reverse, or modify the initial decision or remand to the hearing officer for such further proceedings as [she] may deem appropriate."  *Id.* § 11.56(a).  Once the USPTO Director enters a final decision,[2] the practitioner may file a petition for review of the final decision before the U.S. District Court for the Eastern District of Virginia. 35 U.S.C. § 32; *see also* 37 C.F.R. § 11.57.

## II.    FACTUAL BACKGROUND

### A.    Ms. Pasquine's Professional History, Including Her Tenure at LegalForce

Ms. Pasquine is a trademark attorney, who was admitted to practice law in New York in 1996.  A30 ¶ 1, A66 ¶ 1, A377 ¶ 1, A481, A497.[3]  That same year, she started at the USPTO as a trademark intern and eventually became a trademark examining attorney (i.e., doing trademark prosecution) from 1997–1999.  A30 ¶ 2, A66 ¶ 2, A377 ¶ 2, A482, A497, A7783.  She then left the agency and spent more than a decade in private practice specializing in trademark prosecution. A482, A497.

On July 10, 2017, Ms. Pasquine began working for LegalForce as a Senior Trademark Attorney in a remote capacity from her home in Arlington, Virginia.  A30 ¶ 3, A66 ¶ 3, A377 ¶ 4, A492, A7783.  LegalForce is a law firm that primarily provides trademark legal services, including

---

[2]  The USPTO Director delegated final authority to adjudicate disciplinary proceedings to the USPTO's Office of General Counsel on October 4, 2006 through Delegation of Authority No. 06-01.  *See, e.g.*, *In re Piccone*, Proceeding No. D2015-06 (USPTO May 25, 2017) (Final Order) at 2 n.1, *available at* https://foiadocuments.uspto.gov/oed/0942_dis_2017-05-25.pdf.

[3]  Citations beginning with "A" refer to specific pages in the Administrative Record.

filing trademark applications, trademark prosecution, and Trademark Trial and Appeal Board proceedings. A7784–85. Its owner and founder is Raj Abhyanker. A680, A962. While the firm is headquartered in California, A920, its trademark operations are primarily based in Arizona. A377 ¶ 5, A978. Critically, non-practicing assistants located in Nagpur, India were responsible for, inter alia, obtaining signatures for trademark filings with the USPTO. A38 ¶ 42, A69 ¶ 42, A519–20, A663.

Ms. Pasquine was the attorney of record in many trademark applications filed by LegalForce clients. A31 ¶ 9, A67 ¶ 9, A378 ¶ 8. As the attorney of record, she caused to be prepared, signed, and filed trademark documents on their behalf, including documents in which another LegalForce attorney was the attorney of record. A31 ¶¶ 9–10, A67 ¶¶ 9–10, A378 ¶¶ 9–10. She was familiar with the signature rules, A7789, and knew that improper signatures could render a client's trademark registration vulnerable to cancellation, A536; *see also* Am. Pet. ¶¶ 80–81. Ms. Pasquine left LegalForce on March 29, 2019. A30 ¶ 3, A66 ¶ 3, A7784.

### B.     Permissible and Impermissible Signature Practices Before the USPTO

#### 1.     There are three permissible signature practices.

The Trademark Electronic Application System ("TEAS") is the USPTO's electronic trademark filing and prosecution system accessed through USPTO.gov. A31 ¶ 14, A67 ¶ 14, A378 ¶ 11, A7686. Through TEAS, trademark documents are electronically prepared, signed, and filed with the USPTO. *Id.* All forms filed on TEAS have to be "personally signed" by the named signatory. A31–32 ¶¶ 15–16, A67 ¶¶ 15–16, A378–79 ¶¶ 14–17, A7687; *see also* 37 C.F.R. § 2.193(a),(c). There are three signature methods that may be used for trademark filings on TEAS. A7687–88.

The first signature method is the "Direct Sign" method (or "DIRECT" method) and that is

the default method on TEAS.  A32 ¶ 17, A67 ¶ 17, A378 ¶ 12, A7688–89.  A DIRECT signature is when applicants preparing the trademark documents personally enter their electronic signatures by entering any combination of letters, numbers, spaces, and/or punctuation marks that he or she has adopted as a signature and then uploads those documents onto TEAS.  *Id.*

The second signature method is referred to as the "ESIGN-ON" method.  A32 ¶ 18, A67 ¶ 18, A378 ¶ 13, A7688.  An ESIGN-ON signature involves: (a) sending a link containing trademark documents that require signatures to the applicants; (b) signing of those documents by applicants; and (c) uploading of those documents onto TEAS.  *Id.*  The ESIGN-ON method is typically used by law firms, i.e., the firms prepare trademark filings and send them in a link to clients for their signatures, the clients sign those filings, and the firms upload them onto TEAS. A7688–89.

The third signature method is "the old-fashioned[,] pen-and-ink signature" procedure. A7689.  The applicants print the trademark filings from a computer, sign them, scan them onto the computer, and then upload them onto the TEAS.  *Id.*

### 2.    LegalForce had an impermissible signature practice.

LegalForce non-practitioner assistants were responsible for obtaining client signatures on trademark filings.  A38 ¶ 42, A69 ¶ 42, A519–20, A663, A7131–35, A7791, A7793.  But Ms. Pasquine never followed up with those assistants for certain trademark documents that she filed to ensure that signatures were actually signed by the clients as opposed to the assistants.  A38 ¶ 42, A69 ¶ 42, A381 ¶ 24, A523, A7165, A7794–95, A7831–32.  She merely assumed that the ESIGN-ON method was used.  A37–38 ¶¶ 37, 42, A68–69 ¶¶ 37, 42, A308, A7794; *see also* A521–23, A537, A7790–95 (she had no copy of LegalForce's procedures for client signatures).

On June 8, 2018, a non-practitioner assistant admitted in an email that a trademark

declaration had "not been signed by the client personally" and thus, "per [LegalForce's] regular practice," the firm "signed on behalf of the client." A821. The assistant believed that because the client had approved the form, "she was able to fill in the client's name on the [f]orm." A980.

### 3.      Ms. Pasquine engaged in an impermissible signature practice.

Ms. Pasquine learned about the June 8, 2018 signature incident the following month, but believed it was a one-time occurrence. A7797, A7800. On October 17, 2018; December 11, 2018; and March 22, 2019, OED sent RFIs to her concerning the impermissible signature practice. A484–88, A504–15, A540–43. In the RFIs, OED provided Ms. Pasquine with a list of trademark documents that were filed with her as the attorney of record and requested information about who entered the signatory's name into the signature block in the filings. A381 ¶ 25, A485–86, A511–15. Without any proof, she insisted that she (and LegalForce) properly used the ESIGN-ON procedure to obtain a client's signature on those particular documents—even though she had no personal knowledge about the firm's procedures regarding client signatures. A521–23, A527, A537, A7790–95. She never had access to the LegalForce email account (trademarks@legalforce.com) that would have contained emails demonstrating that the ESIGN-ON method was used to obtain client signatures. A308, A7994. She had no personal knowledge as to whether her clients personally filed trademark documents. A7794–95. She never gave much thought to how client signatures were obtained. A38 ¶ 42, A69 ¶ 42, A522, A537.

The USPTO has a system called the Trademark Image Capture and Retrieval System or "TICRS." A7692–93. TICRS contains Internet Protocol ("IP") addresses and eXtensible Markup Language ("XML") data regarding trademark submissions. A7693–94. When the DIRECT method is used, the IP address identifies where the submission to TEAS was made, and the XML data reveal how the document was signed. A7693–94, A7698; *see also* A12.

The agency's undisputed metadata (data within data) evidence showed that Ms. Pasquine was an attorney of record for many trademark filings where the DIRECT method was used to enter client signatures (XML data), yet the clients' locations differed from the locations where the filings were signed and uploaded (IP addresses), i.e., while clients were located all over the U.S. and other parts of the world, there were only *three* IP addresses associated with all the DIRECT method filings.  A379–81 ¶¶ 20–22; *see also* A12.  In other words, had the DIRECT method been properly and actually used, the clients' locations would have matched the locations from where the filings were signed and uploaded onto TEAS, i.e., more than three IP addresses.  *See* A12.  The ensuing chart captures Ms. Pasquine's participation in LegalForce's impermissible signature practice.[4] A379–81 ¶¶ 20–22; *see also* A10–11.  And for ease of reference, the documents in this chart may be referred to as the "trademark documents at issue."

---

[4]  At a general level, a "Statement of Use" is an applicant's signed statement, within six months of the registration of the trademark, that the trademark has been commercially used, *see* 15 U.S.C. § 1501(d); a "Section 8 Declaration" is the applicant's signed statement that the trademark is in commercial use (or non-use due to special circumstances) between the fifth and sixth year after registration of the trademark, *see id.* § 1058(a)(1); a "Response to Office Action" is a signed response to written correspondence from the USPTO about actions it is taking on the application for a trademark, *see* 37 C.F.R. §§ 2.61–2.62; and a "Revocation, Appointment, and/or Change of Attorney" occurs when the applicant signs a document affecting who is authorized to represent the applicant during trademark prosecution, *see id.* § 2.19.

| Application No. | Type of Filing | Document Filing Date | Name of Signatory | Client Location (Based on Application Information) | IP Address (All in India) | Record Cite for XML Data Showing DIRECT Method |
|---|---|---|---|---|---|---|
| 87/543,640 | Response to Office Action | 1/25/2018 | Terry Katz | Alpharetta, GA | 27.251.65.163 | A4464 |
| 87/590,654 | Response to Office Action | 2/9/2018 | Mike Abbara | Anaheim, CA | 27.251.65.163 | A4571 |
| 85/410,638 | Section 8 Declaration | 3/15/2018 | Elle Murphy | Atlanta, GA | 103.229.27.106 | A4981 |
| 85/299,233 | Section 8 Declaration | 3/16/2018 | Elle Murphy | Atlanta, GA | 103.229.27.106 | A5256 |
| 87/624,073 | Response to Office Action | 3/16/2018 | Mir Ali | Broadlands, VA | 103.229.27.106 | A6944 |
| 85/349,242 | Section 8 Declaration | 3/20/2018 | John Holbert | Phoenix, AZ | 103.229.27.106 | A5387 |
| 85/264,098 | Section 8 Declaration | 3/20/2018 | Earl Holder | Hempstead, NY | 103.229.27.106 | A5636 |
| 87/626,270 | Response to Office Action | 3/21/2018 | Jason Chen | St. Charles, MO | 103.229.27.106 | A7035 |
| 87/597,910 | Statement of Use | 3/21/2018 | Samantha Outridge | Maleny, Australia | 103.229.27.106 | A5686 |
| 87/549,758 | Revocation, Appointment, and/or Change of Attorney | 3/29/2018 | Chris Power | Saratoga Springs, NY | 103.229.27.106 | A5797 |
| 85/953,790 | Section 8 Declaration | 5/1/2018 | Eric Conner | San Diego, CA | 103.106.101.218 | A6138 |
| 87/624,338 | Statement of Use | 5/3/2018 | Chris Stephenson | Pacific Palisades, CA | 103.106.101.218 | A6188–89 |

11

| 87/615,565 | Statement of Use | 5/18/2018 | Shiela Rocchio | Florence, CA | 103.229.27.106 | A6262 |
| 85/727,793 | Section 8 Declaration | 5/29/2018 | George Pilkington | Virginia Beach, VA | 103.229.27.106 | A6724 |
| 87/695,343 | Statement of Use | 6/2/2018 | Edmund Morgan | Kowloon, Hong Kong | 103.229.27.106 | A6775–76 |
| 87/678,155 | Statement of Use | 6/8/2018 | Peng Gu | Yangzhou, China | 103.229.27.106 | A6848 |

Ms. Pasquine would eventually learn, no later than January 29, 2019, that the impermissible signature practice may have affected "*thousands*" of trademark applications and registrations that were handled by LegalForce.   A537, A548 (emphasis added).   She even confirmed that non-practitioner assistants were improperly entering client signatures because of the absence of ESIGN-ON method emails in LegalForce's internal email system, i.e., emails that would have been sent from LegalForce to clients for obtaining signatures through the ESIGN-ON method. A538–39, A7767.   A few days later, on February 1, 2019, the LegalForce Managing Attorney, Ryan Bethell, sent an email to the entire firm in which he acknowledged that the impermissible signature practice "may" have been "widespread."  A773, A810.

Notably, even though Ms. Pasquine could review and approve the work of assistants and ensure that they properly obtained client signatures on trademark documents before their submission on TEAS, *she never did*.  A3681, A7165, A7831–32, A7995 ("Q . . . Can the Legal Force attorneys contact the India team to verify that a signature link was sent to a client?  A. Could have asked, yes.").  Similarly, despite her knowledge of the impermissible signature practice, she did not contact her clients to communicate this issue to them and advise them of the potential impact to their trademark applications and registrations.  A538, A546–47.  She did not contact her clients, A382 ¶ 27, to directly confirm if they personally entered their signatures on any trademark documents before they were filed, A7794, because she did not believe that she had a personal

12

responsibility to take corrective action and instead relied on the actions of the firm, A538, 544–48.

Those actions, however, never alerted her clients to the possible widespread problem of the impermissible signature practice at LegalForce.  In December 2018, Mr. Abhyanker sent emails to some of Ms. Pasquine's clients.  A382 ¶ 29, A2615–20, A2629, A2682.  The emails asked clients, "[h]ow was your experience working with our firm," purportedly to confirm that the client approved and signed all trademark documents filed on TEAS.  A2615–20, A2629, A2682.  The emails also cautioned the clients that the USPTO might send a letter to them asking about their signatures on documents and warned them that they "should speak to independent counsel" before responding to the agency as their responses "may affect [their] trademark rights . . . ."  *Id.*  The emails ended with Mr. Abhyanker telling the clients to "be careful of scam mailers" and providing them a link to a website concerning misleading notices.  *Id.*

### C.   Administrative Proceedings

Based on these facts, both the ALJ and the USPTO Director concluded that Ms. Pasquine violated 37 C.F.R. § 11.103 for failing to act with reasonable diligence by not ensuring that non-practitioner assistants were obtaining client signatures properly on trademark documents where she was an attorney of record, and 37 C.F.R. §§ 11.104(a)(3),(b) for failing to reasonably inform her clients about the impermissible signature practice when she learned about it and the potential consequences thereof.

#### 1.   ALJ's Interim Decision

On July 2, 2019, the OED Director filed a Complaint and Notice of Proceeding ("Complaint") against Ms. Pasquine that alleged multiple violations of the USPTO Rules of Professional Conduct. A29–51.   An ALJ conducted a hearing on February 11, 2020, in

13

Washington, DC.  A7674–7923.  On August 13, 2021, the ALJ issued an Initial Decision.  A1–26.  The ALJ concluded that Ms. Pasquine did not exercise reasonable diligence under 37 C.F.R. § 11.103 when she failed to determine whether and how LegalForce non-practitioner assistants were obtaining client signatures and filing documents with the USPTO, and when she failed to ensure that her clients' matters were handled properly.  A9, A14–15.  The ALJ also concluded that she violated  37 C.F.R. §§ 11.104(a)(3), (b) as she "never directly inquired" with her clients or the non-practitioner assistants about who signed the trademark documents for which she was an attorney of record, despite learning that "thousands of LegalForce's filings with the USPTO could have been affected by the impermissible signature practice," much less inform her clients about this problem that could have affected their applications or registered trademarks.  A8, A16–18.

Given these conclusions,[5] and in accordance with 37 C.F.R. § 11.54(b), the ALJ found that Ms. Pasquine violated duties owed to her clients by "not ensuring their matters were handled with reasonable diligence" and that she failed to communicate to her clients "the likelihood that their trademark applications had been affected."  A22.  In addition, the ALJ found that Ms. Pasquine's negligent conduct had "the potential to cause actual injury to the clients, because their trademark registrations could [have been] subject to cancellation."  A22–23.  The ALJ also found that three aggravating factors were present: Ms. Pasquine engaged in a pattern of misconduct, committed multiple offenses of the USPTO Rules of Professional Conduct, and had substantial experience in

---

[5]  In the Complaint, the OED Director also claimed that Ms. Pasquine violated 37 C.F.R. §§ 11.303, 11.503, 11.804.  A38–40.  The ALJ rejected those claims, and the OED Director did not appeal those rejections to the USPTO Director.  A13–14, A15–16, A18–19.  In a similar vein, the ALJ also found that four particular trademark documents that the OED Director raised during the proceedings were not in fact tainted by an impermissible signature.  A13.  The OED Director again did not appeal those findings to the USPTO Director.  To be clear, those documents are not identified in the chart above on pages 11–12 of this Response.

14

the practice of trademark law.  *Id.*  Therefore, the ALJ determined the appropriate sanction to be a public reprimand and 12 months of probation.  A24.

### 2.    USPTO Director's Final Decision

The USPTO Director affirmed the ALJ's decision.  A8050–72.  The USPTO Director agreed with the ALJ that Ms. Pasquine failed to diligently represent her clients under 37 C.F.R. § 11.103 as she never verified with non-practitioner assistants as to how her clients' signatures were obtained on trademark documents that she filed with the USPTO.  A8059, A8060–62.  The USPTO Director also agreed with the ALJ that Ms. Pasquine failed to reasonably inform her clients about the impermissible signature practice at LegalForce once she learned about it and how it jeopardized their trademark applications and registrations in violation of 37 C.F.R. §§ 11.104(a)(3),(b).  A8059, A8062–64.  Therefore, the USPTO Director did not disturb the ALJ's sanction of a public reprimand and a year of probation.  A8069–70.

## III.    STANDARD OF REVIEW

This Court's review of the substantive analysis (and ultimate conclusion) provided by the USPTO in its final order is governed by well-settled, and extremely deferential, Administrative Procedure Act ("APA") standards.  *See Bender*, 490 F.3d at 1365–66; *Haley v. Under Sec'y of Com. for Intell. Prop.*, 129 F. Supp. 3d 377, 381 (E.D. Va. 2015) (holding, in case of USPTO discipline, that "[w]hen reviewing agency decisions, the standard is 'highly deferential, with a presumption in favor of finding the agency action valid'" (quoting *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009))).  As such, this Court may reverse the USPTO's decision *only* if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Bender*, 490 F.3d at 1365–66.

As the Supreme Court has explained, the scope of review under this standard is "narrow,"

and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "If [the USPTO] has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Cornish v. Dudas*, 715 F. Supp. 2d 56, 63 (D.D.C. 2010) (quoting *Maresca v. Commn'r of Patents & Trademarks*, 871 F. Supp. 504, 507 (D.D.C. 1994)).[6]  Thus, a court's role under this standard is only "to determine whether the record reveals that a rational basis exists for [the] decision."  *Manufactured Hous. Inst. v. EPA*, 467 F.3d 391, 398 (4th Cir. 2006) (*quoting Natural Res. Def. Council v. EPA*, 16 F.3d 1395, 1401 (4th Cir. 1993)).  In the end, this standard "is only met where a reviewing court can conclude with 'definite and firm conviction' that a clear error of judgment or a mistake has been committed."  *President & Fellows of Harvard Coll. v. Lee*, 589 F. App'x 982, 986 (Fed. Cir. 2014) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1231 (Fed. Cir. 2004)).

## IV.   ARGUMENT

As a preliminary matter, Ms. Pasquine appears to have a misunderstanding concerning the Court's review as she asserts that her discipline should be overturned due to alleged errors by both the ALJ and the USPTO Director.  *See, e.g.*, Am. Pet. ¶ 85.  But 35 U.S.C. § 32 only provides for judicial review of the *USPTO Director*'s *final* decision—not the interim decision of the ALJ.  That review is governed "according to the provisions of the Administrative Procedure Act," *Bender*, 490 F.3d at 1365, which means that only the final agency action can be scrutinized, *see, e.g.*, *Faro v. USPTO*, 2016 WL 10788425, at *4 (E.D. Va. July 29, 2016) (citing *FTC v. Standard Oil Co.*,

---

[6]  Prior to the passage of the Leahy-Smith America Invents Act, appeals of the USPTO Director's disciplinary decisions were exclusively adjudicated by the U.S. District Court for the District of Columbia as opposed to the U.S. District Court for the Eastern District of Virginia.  *Compare* 35 U.S.C. § 32 (2006), *with* 35 U.S.C. § 32 (2018).

449 U.S. 232, 246 (1980)), *aff'd*, 697 F. App'x 1025 (Fed. Cir. 2017); *see also* 5 U.S.C. § 557(b).

So here, this Court reviews "the decision of the [USPTO Director], not that of the ALJ." *Starrett*

*v. Special Couns.*, 792 F.2d 1246, 1252 (4th Cir. 1986) (citation omitted); *see also Kellough v.*

*Heckler*, 785 F.2d 1147, 1149–51 (4th Cir. 1986).   The USPTO Director's sanctions of a public

reprimand and 12 months of probation are not clear errors of judgment, in light of Ms. Pasquine's

violations of 37 C.F.R. § 11.103 and 37 C.F.R. §§ 104(a)(3),(b).

### A.   Ms. Pasquine Did Not Diligently Check That Her Clients Personally Signed Trademark Documents Before She Filed Them With the USPTO.

The USPTO Director correctly and reasonably concluded that Ms. Pasquine failed to act

diligently and promptly in representing her clients before the USPTO in violation of 37 C.F.R.

§ 11.103.   A8059–62.   Critically, Ms. Pasquine never verified whether certain trademark

documents she filed on TEAS bearing client signatures were in fact signed by them.   A38 ¶ 42,

A69 ¶ 42, A381 ¶ 24, A523, A7165, A7794–95, A7831–32.   She *assumed* that the ESIGN-ON

method was used to obtain the signatures on those documents, but had no personal knowledge

confirming that assumption.   A37–38 ¶¶ 37, 42, A68–69 ¶¶ 37, 42, A308, A7794.   She never once

accessed the LegalForce email account that would have affirmatively demonstrated that client

signatures were obtained through the ESIGN-ON method.   A308, A7994.   Ms. Pasquine also

*assumed* that the firm's policy was to have clients personally sign trademark documents, but she

had no copy of that policy.   A521–23, A537, A7790–95; *see also* A821.   Given her assumptions,

she never gave much thought to how her clients' signatures were obtained.   A38 ¶ 42, A69 ¶ 42,

A522, A537.[7]

---

[7]   The citation to A537 is one page of a five-page OED Internal Memorandum ("Memorandum") that memorializes an interview that OED personnel conducted with Ms. Pasquine on March 5, 2019.   A535–39.   Ms. Pasquine challenges the USPTO Director's reliance on this Memorandum

And her assumption turned out to be mistaken.  The record demonstrates that between January 2018 and June 2018, Ms. Pasquine was an attorney of record on many trademark documents where the DIRECT method—as opposed to the ESIGN-ON method—was used to enter client signatures.  *See supra* pp. 11–12  (chart of trademark documents at issue).  But the clients did not sign those documents directly; non-practitioner assistants did.  As admitted by a LegalForce non-practitioner assistant on June 8, 2018, LegalForce's "regular practice" at that time was to "sign[] [documents] on behalf of the client[s]."  A821.  The assistants were under the unfortunate impression that they could sign trademark documents on behalf of clients, so long as the client

---

because the ALJ admitted the Memorandum at the hearing merely as administrative background and so she did not substantively challenge the Memorandum. Am. Pet. ¶ 83. The challenge misses the mark for several reasons. First, the USPTO Director reviewed the ALJ's initial decision de novo and was not bound by the ALJ's evidentiary rulings, so relying on some aspect of the Memorandum in a substantive fashion was not prohibited. 37 C.F.R. § 11.56(a) ("On appeal from the initial decision, the USPTO Director has authority to conduct a de novo review of the factual record. The USPTO Director may affirm, reverse, or modify the initial decision or remand the matter to the hearing officer for such further proceedings as the USPTO Director may deem appropriate.").

Second, Ms. Pasquine had several opportunities during the disciplinary proceedings to correct any alleged inaccuracies with the Memorandum's documenting of her interview. Importantly, her attorney at the hearing before the ALJ (she was not pro se back then) not only cross-examined a USPTO witness about the substance of the interview, i.e., her attorney opened the door for aspects of the Memorandum to be used as substantive evidence, A7763–67, but the attorney also examined Ms. Pasquine about what occurred (or did not occur) during the interview, A7850–51. And on appeal to the USPTO Director, she never took issue with substantive reliance on the Memorandum by the OED Director. *Compare* A7999–8033 (OED Director Brief to USPTO Director), *with* A7969–98 (Pasquine Brief to USPTO Director), *and* A8036–46 (Pasquine Reply Brief to USPTO Director). Third, even without the Memorandum, the USPTO Director had sufficient evidence to reasonably conclude that Ms. Pasquine was not diligent in ensuring that the trademark documents at issue had proper client signatures. The record demonstrated that Ms. Pasquine had no personal knowledge that the trademark documents at issue were personally signed by the clients—she just assumed they were. A37–38 ¶¶ 37, 42, A68–69 ¶¶ 37, 42, A308, A521–23, A537, A7165, A7831–32, A7790–95. And the USPTO had data for these documents that reasonably evidence that they were not personally signed by the clients. *See supra* pp. 11–12 (chart of trademark documents at issue).

approved those documents.  A980.  Only *after* this date could LegalForce have had any possible semblance of a firmwide policy that correctly instructed non-practitioner assistants to ensure that clients personally signed trademark documents going forward.  *See* A827.  But by then, Ms. Pasquine had already filed many trademark documents relying on the impermissible signature practice.  *See supra* pp. 11–12 (chart of trademark documents at issue).

Ms. Pasquine attempts to distance herself from the trademark documents at issue, arguing that her involvement with them was limited to being a mere attorney of record for the clients associated with these documents and that she did not personally handle the filing or review of these documents.  Am. Pet. ¶¶ 47–53, 55, 57, 60.  But she has admitted otherwise and cannot run from those admissions, i.e., she "caused" the documents tainted by the impermissible signature practice to be filed with the USPTO.  A378 ¶¶ 9–10 ("As the attorney of record in these trademark applications pending before the USPTO, [Ms. Pasquine] caused to be prepared, signed, and filed trademark documents on behalf of LegalForce clients.  [She] also caused to be prepared, signed, and filed trademark documents, such as Responses to Office actions, on behalf of LegalForce clients in trademark applications pending before the USPTO in which another LegalForce attorney was the attorney of record."); *see also* A31 ¶¶ 9–11, A34–36 ¶ 28, A67 ¶¶ 9–11, A68 ¶ 28, A379–80 ¶¶ 14–17.

In a similar vein, she argues that as merely an attorney of record on these tainted documents, she should not bear the consequences of what *other* attorneys of record may have done, such as approving the filings with the improper signatures.  *See* Am. Pet. ¶¶ 54, 56.  She faults the USPTO Director for effectively applying a strict liability standard here.  *See id.*  But the USPTO Director did not apply such a standard.  Only after considering all of the circumstances confronting Ms. Pasquine at LegalForce, did the USPTO Director conclude that Ms. Pasquine acted

19

unreasonably and violated 37 C.F.R. §§ 11.103, 11.104(a)(3),(b).  *See* A11 (defining reasonable conduct); A12 ("[Ms. Pasquine] relied on a variety of assumptions with regard to LegalForce's signature policies and, had she exercised *reasonable* diligence, she should have ensured that assistants were appropriately obtaining signatures on trademark documents" (emphasis added)); A14 ("While [Ms. Pasquine] may not have had notice of LegalForce's impermissible signature practice initially, she had *reason* to believe that her clients may be affected by LegalForce's impermissible signature practice" after the first RFI was sent, triggering an obligation to alert her clients about the practice (emphasis added)); *id.* ("*should have* taken some steps to personally notify her clients of potential signature issue and its[] implications" no later than January 29, 2019 when she learned that the issue may have been widespread (emphasis added)).

And even if the USPTO Director applied a strict liability standard, that was not irrational, abusive, or contrary to law.[8]  As the USPTO Director reasonably concluded, even if she were merely a passive spectator as the trademark documents at issue were being filed by colleagues using impermissible signatures (contrary to the aforementioned admissions), that was irrelevant. A8067.  She established an *attorney-client relationship* with each of the clients identified on these documents and does not dispute doing so.  *Id.*  She was thus bound by all USPTO Rules of Professional Conduct in representing those clients before the USPTO, including ensuring that client signatures were permissibly obtained on the trademark documents at issue.  *Id.*; *cf. Dela Rosa v. Scottsdale Mem'l Health Sys., Inc.*, 136 F.3d 1241, 1244 (9th Cir. 1998) ("[I]t should never be forgotten that the attorney of record is ultimately responsible for *both* the form and the content

---

[8]  The USPTO Director has found similarly-situated LegalForce attorneys who engaged in the impermissible signature practice as having violated 37 C.F.R. § 11.103.  A4093–94, A4112; *see also* A8061 (citing similar cases, *available at* https://go.usa.gov/xeMXF and https://go.usa.gov/xeMXP).

of the materials submitted to this court.  It is therefore the professional duty of the attorney of record to ensure through proper supervision that all materials submitted to this court comply with the applicable rules."); *Fabick, Inc. v. Fabco Equip., Inc.*, 2016 WL 5718252, at *2 (W.D. Wis. Sept. 30, 2016) ("attorney of record on . . . trademarks" reflects an "ongoing representation"); *Prestex, Inc. v. United States*, 4 Cl. Ct. 317, 321 (1984) ("[T]he sole responsibility for ensuring compliance with court filing deadlines lay with the attorney of record in the case.  Even if the attorney of record had delegated work in the case to another attorney, it was the attorney of record, not the attorney to whom the work had been delegated, who was answerable to the court and the client for any failure to comply with filing requirements." (citations omitted)), *aff'd*, 746 F.2d 1489 (Fed. Cir. 1984).  Neither she nor her clients terminated her representation of them before the USPTO.  *See* 37 C.F.R. § 2.19(b).  The USPTO Director was not required to give her a pass under these circumstances, and she cites no authority condoning her conduct (or the lack thereof).

Ms. Pasquine also attempts to divorce herself from the impermissible signature practice by contending that she had "little opportunity" to (contemporaneously) discover the practice at the time she filed the tainted trademark documents because she had limited contact with the non-practitioner assistants that handled those documents.  Am. Pet. ¶¶ 58–60.  But nothing in the record remotely suggests that she could not have contacted these assistants (for example, by email) and inquired as to how the signatures on the documents were obtained before she filed them.  A7995 ("Q . . . Can the Legal Force attorneys contact the India team to verify that a signature link was sent to a client?  A.  Could have asked, yes."); *see also* A7831–32.  In fact, she did communicate with them about the filing of trademark documents—she just never inquired specifically about the signatures therein as she (incorrectly) assumed that the assistants properly procured them.  *See* A38 ¶ 42, A69 ¶ 42, A521–22, A537, A7831–32, A7790–95.

Ms. Pasquine then criticizes the USPTO Director for mischaracterizing the extent of her frustration with lack of clear procedures at LegalForce regarding the handling of certain trademark documents.  Am. Pet. ¶ 61.  She claims that her frustration existed only when she first started at the firm, but the USPTO Director found that her frustration lasted throughout her tenure there.  *Id.* Ms. Pasquine's criticism is unwarranted as she misreads the USPTO Director's finding.  The UPSTO Director merely observed that she became frustrated at one point "during her time at the firm" about the lack of clear procedures regarding certain trademark documents at the firm,[9] and this served as additional proof as to why, as a general matter, she should have followed up with non-practitioner assistants about how they acquired client signatures on the trademark documents that she filed.  A8059, A8062.

In sum, there is a rational basis for the USPTO Director's conclusion that Ms. Pasquine violated 37 C.F.R. § 11.103.  This was not a clear error in judgment.

**B.      Ms. Pasquine Failed to Inform Her Clients About LegalForce's Impermissible Signature Practice, the Implications of That Practice, and Any Remedial Steps That They Should Take.**

The USPTO Director correctly and reasonably concluded that Ms. Pasquine failed to keep her clients reasonably informed about the impermissible signature practice at LegalForce and the potential consequences thereof in violation of 37 C.F.R. § 11.104(a)(3), (b).  A8062–64.  Although Ms. Pasquine may not have had contemporaneous knowledge of the impermissible signature

---

[9]  Even if Ms. Pasquine were correct that the USPTO Director erroneously found that her frustration with the lack of clear procedures at LegalForce extended throughout her tenure there, the record still more than reasonably supports the conclusion that she did not act diligently on behalf of her clients.  At bottom, Ms. Pasquine had no personal knowledge as to whether any of her clients actually signed any of the trademark documents at issue and never followed up with any non-practitioner assistants to verify whether the clients did personally sign those documents. A37–38 ¶¶ 37, 42, A68–69 ¶¶ 37, 42, A308, A521–23, A537, A7165, A7831–32, A7790–95.

practice at LegalForce when she filed the trademark documents at issue—given that she assumed non-practitioner assistants properly gathered client signatures—she should have contacted her clients about the impermissible signature practice and the possible attendant consequences as soon as OED sent her a RFI on October 17, 2018, which informed her that there were potentially improper client signatures on certain trademark documents for which she was the attorney of record.  A484–88.  She did not.  *See* A382 ¶ 27, A544–48.  The OED sent two additional and similar RFIs on December 11, 2018 and March 22, 2019.  A519–32, A540–43.  She should have contacted her clients then as well, but she did not.  *See* A382 ¶ 27, A544–48.

Moreover, Ms. Pasquine admits that by no later than January 29, 2019, she learned that the impermissible signature practice may affect "*thousands*" of trademark applications and registrations at LegalForce.  A537, A548 (emphasis added).  Indeed, Mr. Bethell, the Managing Attorney at LegalForce, emailed the entire firm on February 1, 2019, about the potentially "widespread"[10] nature of the impermissible signature practice.  A773, A810.  At least by this time (if not earlier pursuant to the RFIs that she had already received), she should have contacted her clients about the impermissible signature practice and advised them of any potential consequences to their trademark applications or registrations, as well as any remedial steps to take.  But she did not.  A382 ¶ 27, A544–48.

---

[10]  Ms. Pasquine quibbles with the fact that the USPTO Director read the email as if Mr. Bethell admitted that the impermissible signature practice was widespread, when he merely informed the firm that "the OED ha[d] brought to [the firm's] attention that the [practice] may be more widespread" than the firm originally thought.  Am. Pet. ¶ 84.  Regardless of whether the impermissible signature practice was in fact widespread or may have been widespread, Ms. Pasquine should have started contacting her clients and advising them at least about the possibility that their trademark applications and registrations were tainted by the impermissible signature practice and the implications of such taint, once she read Mr. Bethell's email.

Seeking to wash her hands clean of the impermissible signature practice, Ms. Pasquine accuses the USPTO Director of neglecting to account for the efforts that LegalForce undertook to contact any clients affected by the practice.  Am. Pet. ¶¶ 63–66.  The accusation is unfounded as the USPTO Director considered these efforts and determined that they insufficiently communicated (essentially downplayed) the impermissible signature practice to the firm's clients, let alone advised them as to the possible consequences stemming from the practice.  A2615–20, A2629, A2682, A8063–64, A8069.  Specifically, Plaintiff relies on a December 10, 2018 email that LegalForce founder, Mr. Abhyanker, sent to firm clients.  *See* A8063–64, A8069.  But that email solicited feedback regarding client satisfaction and actually warned clients to avoid responding to communications from the USPTO without consulting an attorney.  A8063–64 (citing A2615–20, A2629, A2682).  It never once referenced an impermissible signature practice, much less the possible consequences and potential remedial steps the client should take if they were affected.  *Id.*  And, Ms. Pasquine never reviewed that email before it was sent to the firm's clients.  A7824–25.

Ms. Pasquine raises additional efforts by LegalForce to apprise its clients of the impermissible signature practice that the USPTO Director purportedly overlooked.  *Compare, e.g.*, Am. Pet. ¶¶ 64–66, 69–78, *with* A7969–96, A8036–46.  But none of these efforts excuse Ms. Pasquine's failure to contact her clients about the practice.  First, sometime in the first quarter of 2019, she requested that Mr. Bethell search the trademarks@legalforce.com email account for the existence of signature emails that would indicate whether the impermissible signature practice affected her clients specifically (i.e., emails showing that the ESIGN-ON method was used).  Am. Pet. ¶¶ 64–65, 69; A308.  Setting aside that the record lacks any evidence of whether Mr. Bethell actually checked that email account, there is no evidence that Ms. Pasquine ever followed up with

Mr. Bethell to query the results of any search he did so as to confirm whether her clients were indeed affected by the impermissible signature practice.[11]   Second, Ms. Pasquine relies on a Freedom of Information Act ("FOIA") request, *which is not in the record*, that Mr. Abhyanker submitted to the USPTO on February 25, 2019 that allegedly sought information about any trademark documents filed by LegalForce where the DIRECT method was used for signatures. Am. Pet. ¶¶ 72–73.   But this is not an effort by Ms. Pasquine (or LegalForce for that matter) to communicate the impermissible signature practice to her clients.   Third, she relies on another round of email communications by the firm to its clients on March 8, 2019.   *Id.* ¶¶ 64, 73, 75, 76; A545, A7825.   These communications, however, are not in the record and their full content is unknown. Ms. Pasquine has, at most, indicated only that the communications "request[ed] ratification of client signatures."   A545.   But such a request does not implicitly mean that clients were also advised of the impermissible signature practice or the possible consequences and potential remedial steps they should take if they were affected.   Like the December 2018 email, she did not review the March 2019 before it was sent.   A7824–25.

Another argument that Ms. Pasquine proffers is that the USPTO Director did not consider that she had doubts about the accuracy of OED's allegations that her clients had been affected by the impermissible signature practice.   *Compare, e.g.*, Am. Pet. ¶¶ 64, 66, 67–68, 76–78, *with* A7969–96, *and* A8036–46.   But that doubt is unsupported by the record and unreasonable.[12]   The

---

[11]   If Ms. Pasquine is also relying on a "spot check" that Mr. Abhyanker conducted on the trademarks@legalforce.com email account sometime around early February 2019, that effort is of no aid to her either.   Am. Pet. ¶ 71.   A "spot check" is no proxy for direct and affirmative communications from Ms. Pasquine to her clients about the impermissible signature practice, once she became aware that *thousands* of LegalForce clients could have been impacted by it.

[12]   Ms. Pasquine argues that the USPTO Director "took up the OED's position that [she] should have checked the OED Reading Room for cases regarding her duties."   Am. Pet. ¶ 86.   The USPTO

record shows that she never had personal knowledge of whether the trademark documents at issue were in fact personally signed by her clients, even though all of the documents were signed using the DIRECT method.   A37–38 ¶¶ 37, 42, A68–69 ¶¶ 37, 42, A308, A521–23, A537, A7165, A7831–32, A7790–95; *see also supra* pp. 11–12 (chart of trademark documents at issue).   And any doubts about the OED's allegations should have been erased once Ms. Pasquine learned, on or about January 29, 2019, that the impermissible signature practice may have affected "thousands" of trademark applications and registrations handled by LegalForce, A548, or once she received Mr. Bethell's email on February 1, 2019, confirming the potentially "widespread" nature of the problem, A773, A810.

In sum, there is a rational basis for the USPTO Director's conclusion that Ms. Pasquine violated 37 C.F.R. §§ 11.104(a)(3),(b).  This was not a clear error in judgment.

### C.   Ms. Pasquine's Conduct Caused Significant Potential Injury to Her Clients.

Ms. Pasquine levies two perfunctory attacks on the USPTO Director's discipline of a public reprimand and 12 months of probation under 37 C.F.R. § 11.54(b).  First, she maintains that the USPTO Director should have found that her conduct was not likely to cause potential injury to her clients, such as rejection of trademark applications or cancellations of registered trademarks, because there are a myriad of simple solutions to overcome an impermissible signature on a trademark document.  Am. Pet. ¶¶ 79–81.  The UPSTO Director rightly discounted these asserted

---

Director's decision did not reference a reading room.  If Ms. Pasquine is attempting to argue that her conduct is forgivable because she could not find any precedent that her use of the impermissible signature practice was a violation of ethical regulations, that argument is misplaced.  She, as an experienced trademark attorney, admitted that USPTO regulations and practice require clients to personally sign trademark documents.  A378–79.

solutions as Ms. Pasquine "never undertook" any "remedial action on behalf of her clients" to limit their risk of potential injury.  A8070.

Second, and *never* raised with the USPTO Director,[13] Ms. Pasquine stresses that her discipline is not commensurate in scope with her unethical conduct and that she should be left off the hook because other LegalForce attorneys that the OED also investigated for engaging in the impermissible signature practice have already been disciplined.  Am. Pet. ¶¶ 87–88.  According to her, these LegalForce attorneys—Heather Sapp and Renuka Rajan—received the same public reprimand and 12 months of probation that she did and yet the extent of their impermissible signature practices were greater than hers.  *Id.*  The record does not bear that out.  Simply put, Ms. Pasquine, Ms. Sapp, and Ms. Rajan, have all filed, as attorneys of record, "*numerous*" trademark documents using the impermissible signature practice, and they never took immediate, remedial steps once they learned about the practice.  A4092, A4110 (emphasis added).  The USPTO Director has actually shown Ms. Pasquine *leniency*.  She received the same discipline as both Ms. Sapp and Mr. Rajan, notwithstanding the fact that they showed—and Ms. Pasquine has not—"contrition" and accepted responsibility for their impermissible signature practices.  A4093, A4111.

Finally, Ms. Pasquine (or any other attorney that engaged in the impermissible signature practice) is no less susceptible to discipline just because the USPTO Director has already sanctioned Ms. Sapp and Ms. Rajan for their involvement in the practice.  Were the USPTO Director to turn a blind eye to Ms. Pasquine's conduct, that would send the message that the

---

[13] A petitioner waives arguments that were never made to, and thus never considered by, the USPTO Director.  *See, e.g.*, *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1362 (Fed. Cir. 1999); *Pleasant Valley Hosp., Inc. v. Shalala*, 32 F.3d 67, 70 (4th Cir. 1994) ("As a general matter, it is inappropriate for courts reviewing appeals of agency decisions to consider arguments not raised before the administrative agency involved."); *see also Lewis v. United States*, 476 F. App'x 240, 243 (Fed. Cir. 2012).

USPTO condones the impermissible signature practice—a clear violation of established regulations governing attorney practice and conduct before the USPTO—to some degree. It does not, and the Court should not suggest otherwise.

In sum, there is a rational basis for the sanctions that Ms. Pasquine received, and they do not reflect a clear error in judgment.

## V.   CONCLUSION

For the foregoing reasons, this Court should reject Ms. Pasquine's challenge to the USPTO Director's imposition of discipline and affirm the USPTO Director's decision.

December 12, 2022                                    Respectfully Submitted,

                                                    JESSICA D. ABER
                                                    UNITED STATES ATTORNEY

                                                    *By*: /s/ Hugham Chan
                                                    HUGHAM CHAN
                                                    Assistant United States Attorney
                                                    2100 Jamieson Avenue
                                                    Alexandria, Virginia  22314
                                                    Tel:  (703) 299-3743
                                                    Fax:  (703) 299-3983
                                                    Email:  hugham.chan@usdoj.gov

                                                    *Counsel for Respondent*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, I caused a copy of the foregoing to be placed in the United

States mail, first-class postage prepaid, addressed to the pro se Petitioner as follows:

Elizabeth Pasquine
2601 Park Center Drive, C710
Alexandria, Virginia 22302
Telephone: (207) 469-8284
Email:elpasquine@gmail.com

*Pro se Petitioner*

_____/s/_____
HUGHAM CHAN
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3743
Fax:        (703) 299-3983
Email:  Hugham.Chan@usdoj.gov

December 12, 2022                    *Counsel for Respondent*